## COMMERCIAL CASUALTY INS. CO. v. HAMRICK.

### No. 11206.

Court of Civil Appeals of Texas. Dallas.
April 15, 1933.

Rehearing Denied May 20, 1933.

Jno. D. Reese, of McKinney, and Church, Read & Bane, of Dallas, for appellant.

L. J. Truett, of McKinney, for appellee.

LOONEY, Justice.

Lester J. Hamrick sued the Commercial Casualty Insurance Company upon a health and accident policy, claiming indemnity for an injury received through external, violent, and accidental means, necessitating the amputation of his left foot, and resulting in loss of time by reason of being totally and continuously disabled from performing duties pertaining to any business or occupation for a period of six months, praying judgment for the amount due under the policy with 12 per cent. damages, reasonable attorneys' fee, and interest.

Defendant's answer contains a plea denying that the policy ever became effective, because plaintiff was not in good health and free from injuries when the same was delivered, as required by a provision of the policy; also denied liability because of alleged false representations made by plaintiff in the application for insurance material to the risk and relied upon by defendant in issuing the policy; also alleged that plaintiff's suffering, loss of time, and the amputation of his left leg, resulted primarily and exclusively, or were contributed to, by a previously existing unsound and diseased condition of his leg

and foot, and did not result directly, exclusive of all other causes, from bodily injury sustained during the life of the policy, through external, violent, and accidental means.

In a supplemental petition, plaintiff specially denied that he made false representations, alleged that he correctly informed defendant's agent, a Mr. Lankford, as to his existing physical condition, and that, if defendant's said representative failed to correctly write plaintiff's answers in the application, the failure was due to the fault of said representative, wherefore, plaintiff claimed that defendant waived the provision of the policy relating to plaintiff's physical condition at the time of the application, and delivery of the policy; also alleged that the existing condition of his leg did not cause pain or suffering or give trouble, other than the inconvenience of being a cripple, and had not for at least twenty-five years prior to the injury complained of; that his physical condition was sound when the policy was issued, and, but for the injury complained of, amputation of his leg would not have been necessary.

The material facts are these: When plaintiff was about nine years of age, about twenty-five years before the issuance of the policy sued upon, he was injured by sticking a small weed in his left knee, blood poison set up in the wound, the fluid nature furnished for his knee joint escaped, resulting in a stiff knee, and for about fifteen or eighteen years had used a peg leg fastened to his knee or leg with a leather strap; prior to the transactions involved here, plaintiff was engaged in the barber business, and, for about five years prior to taking out the insurance, his leg, between the knee and foot, would swell considerably in the daytime, and subside at night when he was not standing or walking, the swelling being due to poor circulation caused by the leather strap binding his knee to the peg; however, this condition did not produce pain.

On November 12, 1929, plaintiff was solicited by W. W. Lankford, defendant's representative, to take out the policy in suit; at that time, plaintiff was wearing the peg, his leg was shown to the solicitor, who examined same, was given a history of the injured limb; plaintiff also informed Lankford that he had never been able to get insurance because of the condition of his leg; Lankford stating that he would examine the leg and write about it in the application, and, if accepted, plaintiff's policy would be as good as anybody's; thereupon, Lankford propounded to plaintiff questions contained in the application, and, when answered, pretended to write plaintiff's answers; the application, when finished, was signed by plaintiff on the supposition that Lankford had written in his answers correctly. On the day the application was taken, Lankford countersigned the policy, also a special policy agreement indorsed on the policy over the words "authorized representative," the signatures of the president and secretary to the policy being in scrip. From these circumstances, it is obvious that Lankford had blank policies, was authorized to fill, countersign, and deliver same, in fact, did deliver the policy to plaintiff about a week after the application was taken.

On January 15, 1930, while driving an automobile, plaintiff received an injury to his left leg, between the knee and ankle, caused by his car skidding and running into a ditch, throwing his leg against the door, and, after leaving the car, slipped and fell, his testimony being that he is uncertain whether his leg was injured when thrown against the door of the car, or when he slipped and fell upon the ground, at the time, covered with ice and slippery. The injury consisted of a deep cut on his leg about two inches long, also in its being bruised. Plaintiff was immediately treated by Dr. Wolford, of McKinney, which continued for about a week; in the meantime, his leg grew worse, the wound seemed to heal, formed a scab, which would come off leaving the wound raw, and, after about a week, was advised by his physician to consult Dr. Carroll, of Dallas, who advised amputation. Plaintiff returned to McKinney, and later, was also advised by Dr. Wolford to have his leg amputated. Prior to the recent injury, Dr. Wolford had never advised amputation, plaintiff had never had an idea of having his leg amputated, but did consider having it straightened. Plaintiff testified further that, from the time of the recent injury until the amputation he suffered all the time, and for that reason, only, he had his leg amputated; that after recovering from the prior injury, he was not troubled with the crippled leg, suffered no pain, lost no time from his work on account of its condition, was in good health at the time he signed the application for the policy, and at the time the same was delivered, and had been in that condition for twenty-five years; that after his leg was injured, in January, 1930, it was about six months before he was able to do any work at all, and, during that period, was under the care of Dr. Wolford.

The case was submitted to a jury on special issues, and, as answers to issues 1, 3, 7, and 8 are not objected to, they will be set off to themselves as follows: That on or about January 15, 1930, while driving in an automobile, plaintiff sustained a bodily injury solely through external, violent, and accidental means; that the injury resulted directly, and exclusive of all other causes, in an immediate, continuous, and total disability that prevented plaintiff from performing any and every duty pertaining to his business or occupation (in response to another

issue the jury found that the disability continued for 5½ months); that plaintiff informed Lankford, defendant's agent, that his left leg was swollen at the time the application was taken, that he wore a peg leg, gave him full information in regard to the prior injury to his leg; that plaintiff's answer contained in the application, to the effect that his habits of life were correct and temperate, and that he was in a sound condition mentally and physically, was written therein by Lankford.

The answers of the jury to special issues 2, 4, 5, 6, 9, and 10, objected to by appellant as not supported by evidence, are to the following effect: That the actual injury received by plaintiff (January 15, 1930), alone, rendered necessary the amputation of his leg; that the disability resulting from said injury continued for 5½ months; that during the continuance of such total disability, and within ninety days from the time of the accident, plaintiff's leg was amputated, causing the loss of his left foot; that, at the time the insurance policy in question was delivered to plaintiff, he was in good health and free from all injuries; that, at the time of said accident, plaintiff's leg was not in a diseased or unsound condition; and that its condition was not the sole nor the contributing cause of the amputation; and that, at the time Lankford countersigned the policy in question, he intended to, and did, waive that provision of the policy which required plaintiff to be in good health and free from all injury at the time of the delivery of the policy.

The evidence, in our opinion, fully sustained these findings, and they are adopted as our conclusions on the issues represented.

■ It is not necessary to cite authorities (as they are legion) to sustain the proposition that jury findings sustained by evidence are conclusive upon appellate courts.

■■ Appellant urges a number of propositions that jury findings to the effect that plaintiff was in good health and free from injury at the time the policy was delivered, that his left leg was not in a diseased and unsound condition at the time of the accident, and that the crippled condition of his limb was neither the sole, nor a contributing cause of its amputation, are wrong, unsupported by evidence, and exhibit prejudice on the part of the jury.

Obviously, these contentions are based upon the assumption that the crippled condition of plaintiff's leg was a fact, within itself, sufficient to rebut and show that said findings are wrong and unconscionable. To this we cannot agree. Plaintiff testified that, from the time of his recovery from the injury to his leg, sustained when a child about ten years of age, he had no trouble, nor did he suffer pain, nor lose time from work, on ac-

count of its condition; that he was in good health when the application for the insurance was signed, and at the time the policy was delivered; that he had never felt the necessity, prior to the injury, of having the leg amputated, was induced to do so solely on account of the recent injury; that it was six months after the injury before he could do any work, and during that time was under the constant care of his physician. Dr. Carroll, defendant's witness, testified: That, as a rule, such a crippled condition would produce pain, but not in every case, he said, "that condition might or might not have any effect on his (plaintiff's) general health. The condition is almost purely local and it might be perfectly possible for him to go along, provided it were not painful, and have a fairly good general health or good general health and no trouble at all. * * * With reference to whether or not a man in that condition was a man sound physically * * * I would say that a man in that condition as I just indicated might be physically sound and solid from the standpoint of general health, because there was no infection of it; * * * so I would answer it by saying that he may be in perfect good general health or he may not." The testimony of Dr. Carroll, defendant's witness, alone, furnished sufficient basis for the findings of the jury on the issue of good health. Many cases presenting similar situations may be found in the reports. See National Life Insurance Co. v. Bean, 15 Ga. App. 661, 84 S. E. 152, 153; Travelers' Insurance Co. v. Duvall, 74 S. W. 740, 25 Ky. Law Rep. 137; Kearns v. North American, etc., Co., 150 Minn. 486, 185 N. W. 659, 661; American National Insurance Co. v. McKellar (Tex. Civ. App.) 295 S. W. 628, 629; Southern Travelers' Association v. Masterson (Tex. Civ. App.) 48 S.W.(2d) 771, 775.

In National Life Insurance Co. v. Bean, supra, the Georgia court said: "Seldom does one have a serious physical ailment not complicated by other diseases or physical disturbances; and if proof of a pre-existing disease, or of some concurrent ailment, would prevent recovery for disability caused solely by another disease flowing therefrom and a consequence thereof, for and during the period when the last disease was the sole then existing cause of the disability of the claimant, a policy insuring one against certain specific diseases would be worse than valueless." And, in American Nat'l Insurance Co. v. McKellar, supra, the Beaumont Court of Civil Appeals, in an opinion by Justice Walker, discussing a similar situation, said: "The express warranty of the policy was that no obligation attached under the conditions, unless the insured was 'in sound health' when the policy was delivered. The words 'sound health,' as used in a life insurance policy, have been judicially construed. We take the following definition from 7 Words and Phras-

es, First Series, page 6554: 'The words "sound health," as used in the provision in a life insurance policy, do not mean perfect health. We are all born with the seeds of mortality in us. No definition can be given to these words that will apply in all cases, but the term means generally the absence of any vice in the constitution and of any disease of a serious nature that has a direct tendency to shorten life, in contradistinction to a temporary ailment or indisposition. Packard v. Metropolitan Life Ins. Co., 72 N. H. 1, 54 A. 287, 288.' In Brown v. Metropolitan Life Insurance Co., 65 Mich. 306, 32 N. W. 610, 8 Am. St. Rep. 894, the term 'sound health' was said to mean: 'A state of health free from any disease or ailment that affects the general soundness and healthfulness of the system seriously, not a mere temporary indisposition which does not tend to weaken or undermine the constitution of the assured.' "

So we are of opinion that the contentions of defendant, in the respects just discussed, are untenable, both as to the facts and the law; therefore they are overruled.

Defendant says, further, that the jury finding in answer to special issue No. 11 to the effect that the soliciting agent, Lankford, intended to waive the provision requiring plaintiff to be in good health and free from injury at the time the policy was delivered, is entirely unsupported by evidence.

In view of the finding of the jury (amply supported by evidence) to the effect that plaintiff was in good health and free from injury at the time the policy was delivered, issue No. 11 and the jury's answer thereto became immaterial. However, the evidence shows that Mr. Lankford was, not only a soliciting, but, in fact, was a general agent; that, in taking plaintiff's application for and delivering the policy, Lankford's countersignature as an "authorized representative" of defendant, was the final and effective act that consummated the insurance contract, and, when delivery of the policy was made, Lankford acted with full knowledge of the history of plaintiff's prior injury, and of the then condition of his leg and health; hence, Lankford's knowledge of these facts will be imputed to the defendant. Plaintiff answered, truthfully, all questions propounded by Lankford, and besides, at that time, Lankford personally examined plaintiff's leg, and, if the application fails, in any respect, to disclose a material fact, or contains misstatements with reference to any material matter, the fault or dereliction is that of the agent and not of plaintiff. To deliver a policy with full knowledge of facts upon which its validity may be disputed, and then insist upon these facts as a ground of avoidance, is, as stated by our Supreme Court in Liverpool, etc., Co. v. Ende, 65 Tex. 118, "to attempt a fraud." Proceeding further, the court said: "This the courts will neither aid nor presume, and when the alternative is to find this or to find that, in accordance with honesty and fair dealing, there was an intent to waive the known ground of avoidance, they will choose the latter. Such an issue is tantamount to an assertion that the policy is valid at the time of delivery, and is a waiver of the known ground of invalidity." Also see Inter-Ocean, etc., Co. v. Brown (Tex. Civ. App.) 31 S.W.(2d) 333; Commonwealth, etc., Co. v. Coogle (Tex. Civ. App.) 31 S.W.(2d) 362; National Life, etc., Co. v. Muckelroy (Tex. Civ. App.) 40 S.W.(2d) 1115; Lee v. Mutual Protective Association (Tex. Civ. App.) 47 S.W.(2d) 402.

In assignment No. 11, defendant complains of the action of the court in refusing to direct a verdict in its favor, and in assignment No. 12, complains of the action of the court in admitting in evidence, over its objection, testimony of plaintiff detailing the conversation between him and Lankford at the time the application for the insurance was being taken.

These assignments cannot be considered, because urged for the first time on appeal. Occurrences during the progress of the trial (except fundamental errors), unless specified in the motion for new trial, will be considered waived (see subdivision 3, art. 2232, R. S. 1925), and cannot be considered, although embodied in the brief filed on appeal. This provision of article 2232 was not changed by the amendment to article 1844, chapter 75, page 117, Acts of 1931 (Vernon's Ann. Civ. St. art. 1844).

But if proper to consider the assignments, they would be overruled, as neither presents error. Obviously, in view of the undisputed evidence, the court did not err in refusing to direct a verdict for defendant. The testimony objected to was, in our opinion, properly admitted, but, if error, would not be ground for reversal, because, after its admission, defendant read in evidence, from the deposition of plaintiff taken at its instance, substantially the same testimony.

Finding no reversible error, the judgment of the trial court is affirmed.

Affirmed.